Randolph BARBER, Plaintiff,

v.

Rene GUAY, Spencer Havey and Debbie Laskey, Defendants.

Civ. No. 94–294–B.

United States District Court, D. Maine.

Nov. 9, 1995.

Eric M. Menhert, Hawkes & Menhert, Augusta, Maine, for plaintiff.

William R. Fisher, Monaghan, Leahy, Hochadel & Libby, Portland, Maine, for defendants Guay & Harvey.

Michael J. Waxman, South Portland, Maine, for defendant Laskey.

---

## ORDER AND MEMORANDUM OF DECISION

BRODY, District Judge.

On January 5, 1992, Randolph Barber was arrested by Somerset County Deputy Sheriff Rene Guay at Robert Laskey's Rockwood house. Guay issued Barber a summons for theft, under 17–A M.R.S.A. § 353. However the State never prosecuted Barber. Barber now sues Deputy Guay, Somerset County Sheriff Spencer Havey, and Debbie Laskey for violation of his federal civil rights under 42 U.S.C. §§ 1981–1985, discrimination under the Americans with Disabilities Act ("ADA"), 42 U.S. § 12132, and liability pursuant to state tort laws. Barber filed a seven count complaint, specifically alleging: false arrest and excessive use of force (Count I), ADA violations (Count II), failure to properly train under § 1983 (Count III), conspiracy (Count IV), malicious prosecution (Count V), intentional infliction of emotional distress (Count VI), and conversion (Count VII).[1]

All three defendants moved for summary judgment. The law enforcement defendants raise the defense of qualified immunity, while Defendant Laskey argues that Barber failed to adequately substantiate his claims. The Court finds that: (1) Deputy Guay is immune from suit under the illegal arrest charge, but not for the excessive force claim; (2) Sheriff

---

1. Barber filed Counts I (§ 1983), II (ADA), and IV (conspiracy) against Deputy Guay; Counts III (§ 1983 supervisory liability) against Sheriff Havey; and Counts, IV (conspiracy), V (malicious prosecution), VI (intentional infliction of emotional distress), and VII (conversion) against Defendant Laskey.

Havey is immune from suit; and (3) the claims against Debbie Laskey contain factual disputes that preclude summary judgment. The Court denies Plaintiff's Motion to Strike Defendant's Statement of Material Facts.

### I. Summary Judgment

Summary judgment is appropriate in the absence of a genuine issue of any material fact, when the nonmoving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c). An issue is genuine, for summary judgment purposes, if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A material fact is one which has "the potential to affect the outcome of the suit under applicable law." *Nereida–Gonzalez v. Tirado–Delgado,* 990 F.2d 701, 703 (1st Cir. 1993). Facts may be drawn from "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits." Fed.R.Civ.P. 56(c). On summary judgment, the moving party bears the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The Court views the record in the light most favorable to the nonmoving party. *FDIC v. Anchor Properties,* 13 F.3d 27, 30 (1st Cir. 1994).

### II. Background

Plaintiff, Barber, is a veteran, who has been receiving psychological treatment at the Togus VA Hospital. He claims to either, have a disability, or is perceived by others as having a disability. His pleadings note that Barber has been perceived as a "drunk." (Barber Aff. ¶ 4).

Barber entered into a rent-to-purchase agreement with Robert Laskey, for a house located on Marston Street in Rockwood, Maine. Laskey's ex-wife, Debbie Laskey acted as the rental agent for the transaction. In October 1991, Laskey decided he no longer wished to sell the property and told plaintiff to vacate. Barber did, but with the permission of Ms. Laskey, he left certain property in the Rockwood house while he searched for a new place to live. Among other property, Barber claims to have left his boat, a thirty foot Pacemaker Cabin Cruiser, at the Rockwood house.

On or about January 4, 1992, Barber returned to the Rockwood house to collect his possessions. He had previously received permission from Ms. Laskey to spend the night at the house. While gathering his belongings, Barber noticed certain property was missing, specifically his ice shed and ice fishing equipment. Barber asked Ivon Turmel, a part-time Somerset County Sheriff, if he knew anything about this equipment. Turmel replied that he has seen Debbie Laskey's son with the equipment. Barber sought out Ms. Laskey, who denied any knowledge of the equipment, and Barber departed after an ensuing argument. Barber next returned to the Rockwood house to finish packing. He was accompanied by Deputy Turmel, whom he had asked to catalogue the items he took from the house.

While Barber was collecting his property from the Rockwood house, Ms. Laskey arrived with Deputy Sheriff Guay. Guay was apparently responding to a call from Ms. Laskey as to a possible theft at the Rockwood house, although the parties dispute who actually contacted the police. Upon arriving Guay asked Ms. Laskey if all of the property on the truck was in fact Barber's. Ms. Laskey identified an old broken wheelbarrow and an old pair of skis as not belonging to Barber. Barber responded that Mr. Laskey had given him the wheelbarrow, and that Ms. Laskey had given him the skis. To resolve the matter Deputy Guay decided to phone Mr. Laskey, who was in Alaska at the time. As Guay left the scene with Ms. Laskey, he ordered Barber, in Barber's words, "to remain where [he] was and told Mr. Turmel that if [Barber] were to try to leave, [Barber] would be arrested." (Barber Aff. ¶ 31).

According to Guay, Mr. Laskey confirmed ownership of the wheelbarrow in question and Plaintiff was arrested and handcuffed. Plaintiff alleges that Deputy Guay used excessive force in carrying out the arrest by wrenching his arms while handcuffing him, and later throwing him head first into the

back of the police car. (Barber Aff. ¶¶ 34–35). Guay informed Barber that he was transporting him to the county jail in Skowhegan. Barber was worried about his children at the time, and at Barber's behest, Guay agreed to take Barber to Bishop's Store in nearby Jackman, where he was ultimately bailed for $25 and released.

Guay gave Barber a summons to appear in court on November 19, 1992 for theft charges. When Barber appeared in court on the appointed date, he was told his case had been dismissed because no paperwork had been filed in connection with his arrest. Barber believes that Guay never filed the summons with the court.[2]

Spencer Havey, the Somerset County Sheriff, is named in the complaint in his capacity as supervisor of the Somerset County Sheriff's Department. Plaintiff alleges that the failure to properly train Deputy Guay was a direct and proximate cause of Deputy Guay's mishandling of Barber. Defendant Laskey is named in connection with her involvement in Barber's arrest, as well as issues of her knowledge and control of Barber's boat.

### III. Qualified Immunity

When law enforcement officials abuse their offices, "an action for damages may offer the only realistic avenue for vindication of constitutional guarantees." *Harlow v. Fitzgerald,* 457 U.S. 800, 814, 102 S.Ct. 2727, 2736, 73 L.Ed.2d 396 (1982). However, under qualified immunity "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights." *Id.* at 818, 102 S.Ct. at 2738; *Burns v. Loranger,* 907 F.2d 233, 235 (1st Cir.1990). The Supreme Court has extended qualified immunity liberally, such that it protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986). In doing so, the Court has struck a balance between society's

interest in both deterring unlawful conduct and compensating victims of such conduct, and the "risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties." *Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987).

Courts consider two factors with regard to qualified immunity: (1) the constitutional right at issue, and (2) the law enforcement official's conduct. *Id.* at 639–41, 107 S.Ct. at 3038–40; *Burns,* 907 F.2d at 235–36. To overcome qualified immunity, a plaintiff must first allege a violation of a clearly established constitutional right. *Id.* If the right is clearly established, the court can safely assume that the police officer in question knew of this right. *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738; *Rodriguez v. Comas,* 888 F.2d 899, 901 (1st Cir.1989). Second, if the right is clearly established, qualified immunity will only be denied if a reasonable official should have known that the challenged conduct violated that established right. *Harlow,* 457 U.S. at 818–819, 102 S.Ct. at 2738–2739.

While both Deputy Guay and Sheriff Havey plead qualified immunity, their claims involve different factual and legal issues. Consequently, the Court will address their qualified immunity defenses independently.

### A. Deputy Sheriff Guay

Barber asserts that Deputy Guay violated his constitutional rights by first arresting him without probable cause, and second, by using excessive force in conducting that arrest. Barber correctly contends that the Fourth and Fourteenth Amendments to the United States Constitution prohibit such actions. *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989) (Fourth Amendment protects against excessive force); *Wong Sun v. United States,* 371 U.S. 471, 479–80, 83 S.Ct. 407, 412–13, 9 L.Ed.2d 441 (1963) (Fourth Amendment requires probable cause to arrest); *Mapp v.*

---

2. Guay asserts that he gave the necessary arrest reports to the Sheriff's Department, but does not know why these papers did not reach the District Attorney's Office. He suggests that either he submitted the papers to the Sheriff's Department too late, or alternatively, that the Sheriff's Department misplaced the papers and thus did not send them to the District Attorney's Office.

*Ohio,* 367 U.S. 643, 655, 81 S.Ct. 1684, 1691–92, 6 L.Ed.2d 1081 (1961) (Fourth Amendment applicable to the States through the Fourteenth Amendment). Both rights have long been ingrained in this country's criminal justice history. Deputy Sheriff Guay is therefore safely assumed to have been on notice of these rights, as well as the parameters these rights impose on police conduct.

 This case, therefore, turns on the second stage police conduct inquiry—whether a reasonably objective police officer in the same or similar circumstances could have believed that Deputy Guay's behavior violated Barber's constitutional rights. Qualified immunity does not turn on the constitutionality of the conduct in question. *Anderson,* 483 U.S. at 641, 107 S.Ct. at 3039–40. Police officers are not held personally liable when they act reasonably, albeit mistakenly. *Id.* The Court reviews Deputy Guay's conduct to determine whether or not it was objectively reasonable. Specifically the Court must determine whether Guay acted reasonably in: (1) finding probable cause to arrest Barber, and (2) employing force to secure this arrest.

### 1. Illegal Arrest

 The Fourth Amendment prohibits a police officer from making an arrest without probable cause. *Wong Sun,* 371 U.S. at 479–80, 83 S.Ct. at 412–13. Generally an arrest occurs when there is a show of official authority such that a reasonable person would believe that he or she is not free to leave. *Berkemer v. McCarty,* 468 U.S. 420, 422, 104 S.Ct. 3138, 3141, 82 L.Ed.2d 317 (1984); *United States v. Quinn,* 815 F.2d 153, 156–57 (1st Cir.1987). Law enforcement officials do not necessary violate the Fourth Amendment by approaching suspects, questioning them, or detaining them. *Terry v. Ohio,* 392 U.S. 1, 19–20, 88 S.Ct. 1868, 1878–79, 20 L.Ed.2d 889 (1968); *Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 1323–24, 75 L.Ed.2d 229 (1983); *Quinn,* 815 F.2d at 156–57. Not all seizures must be justified by probable cause. *Terry,* 392 U.S. at 19–20, 88 S.Ct. at 1878–79.

 In *Terry v. Ohio,* the Supreme Court created a limited exception to the probable cause requirement of the Fourth

Amendment. *Id.* Under *Terry,* law enforcement officials can detain a suspect upon a reasonable suspicion that a person has committed or is about to commit a crime. *Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972); *Terry,* 392 U.S. at 32–33, 88 S.Ct. at 1885–86 (Harlan, J., concurring); *id.* at 34, 88 S.Ct. at 1886 (White, J., concurring). Such detainment does not constitute a *de facto* arrest. *Quinn,* 815 F.2d at 156–157. The Supreme Court has expanded the *Terry* exception, now investigative stops are "not confined to the momentary, on-the-street detention accompanied by a frisk for weapons." *Id.* at 156 (quoting *Michigan v. Summers,* 452 U.S. 692, 700, 101 S.Ct. 2587, 2593, 69 L.Ed.2d 340 (1981)). This expansion is justified by the need to balance the "limited violation of individual privacy against the opposing interest in crime prevention and detection and in the police officer's safety." *Dunaway v. New York,* 442 U.S. 200, 209, 99 S.Ct. 2248, 2255, 60 L.Ed.2d 824 (1979).

 The Supreme Court has acknowledged the line-drawing problems inherent in distinguishing between an arrest and an investigative stop. *United States v. Sharpe,* 470 U.S. 675, 685, 105 S.Ct. 1568, 1574–75, 84 L.Ed.2d 605 (1985). There is "no scientifically precise formula," *United States v. Zapata,* 18 F.3d 971, 975 (1st Cir.1994), or "mechanical checklist" which dictates the answer to this inquiry, *Quinn,* 815 F.2d at 156. Courts look to a variety of factors in determining whether an arrest has taken place: length of stop, the suspect's freedom of movement, the officer's demeanor, and whether the officer touched the suspect or brandished his or her weapon. *Zapata,* 18 F.3d at 974–75; *see also Quinn,* 815 F.2d at 160–61 (detention not the equivalent of an arrest despite presence of five police officers, a police dog, and a vehicle blocking suspects' car from leaving scene). While several cases have relied heavily on the restraint issue, in *United States v. Quinn,* the First Circuit held that restriction of movement alone does not transform a *Terry* stop into a *de facto* arrest. 815 F.2d at 156–58; *see also United States v. Kapperman,* 764 F.2d 786, 791 n. 4 ("[N]either handcuffing nor other restraints will automatically

convert a *Terry* stop into a *de facto* arrest requiring probable cause."), *reh'g denied,* 770 F.2d 1084 (11th Cir.1985).

Barber was detained and later arrested for stealing property from the Laskey house. Barber characterizes his initial detention as effectively a *de facto* arrest, which he claims was illegal because Deputy Guay lacked probable cause. Barber claims that even if the detention was not an arrest, the subsequent "official" arrest was also illegal because Deputy Guay lacked probable cause. Given Barber's claims, the Court must first determine when Barber was actually arrested, and then determine based on the information Deputy Guay had at that time, whether or not the requisite standard of suspicion existed.

■ Barber argues that when Guay first detained him, he was specifically told he could not leave, and that if he attempted to leave he would be arrested. Guay instructed Barber to stay where he was and told Mr. Turmel that if Barber were to try and leave, he should be arrested. (Barber Aff. ¶ 31). Thus Barber contends that any reasonable man would assume he was not free to move, and thus under arrest. Plaintiff, however, mistakenly assumes that freedom from restraint alone is determinative of whether an arrest occurred.

■ The Court concludes that Barber's initial detention was no more than an investigative detention supported by the proper reasonable suspicion. A reasonable man in Barber's shoes would not have necessarily thought he had been arrested at this juncture. In light of the conflicting stories told by Barber and Ms. Laskey, Deputy Guay decided to telephone Mr. Laskey to verify ownership of the property in question. Barber was detained briefly for investigative purposes. Based on the conflicting claims of ownership and Barber's presence on Laskey's property, Deputy Guay had reasonable suspicion to detain Barber. Once Guay had found Barber it would be "illogical to deny him an opportunity to confirm or dispel the suspicions that had justified the investigative stop in the first place. Checking out a suspicious person is a principal justification for an investigative stop." *Quinn,* 815 F.2d at 157 (citing *Adams,* 407 U.S. at 146, 92 S.Ct. at 1923). While neither party states the exact time that Barber was detained, it seems clear that Guay returned within a reasonable time, soon after he talked to Mr. Laskey. *See United States v. Davies,* 768 F.2d 893, 903 (7th Cir.) (45–minute stop for questioning and advice from police superiors was a valid investigative detention), *cert. denied, Kaprelian v. United States,* 474 U.S. 1008, 106 S.Ct. 533, 88 L.Ed.2d 464 (1985); *Sharpe,* 470 U.S. at 683, 105 S.Ct. at 1574 (30–minute stop to investigate not considered an arrest).[3] Guay's detention of Barber appears not to have been any longer than was necessary to complete the investigation. *E.g., Royer,* 460 U.S. at 500, 103 S.Ct. at 1326 ("an investigative stop must be temporary and last no longer than is necessary to effectuate the purpose of the stop.").

■ This, however, does not end the inquiry because Barber was ultimately formally arrested. Barber challenges this arrest on the grounds that Deputy Guay lacked probable cause. To come within the defense of qualified immunity, Deputy Guay need not have probable cause necessarily; he need only have reasonably believed that there was probable cause to arrest Barber. *Anderson,* 483 U.S. at 641, 107 S.Ct. at 3039–40; *Burns,* 907 F.2d at 237.

■ "Probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates,* 462 U.S. 213, 232, 103 S.Ct. 2317, 2329, 76 L.Ed.2d 527

---

3. In *United States v. Sharpe,* the Supreme Court set forth the following parameters for determining whether a stop was too long to be justified as an administrative stop:

[it is] appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was neces-

sary to detain the defendant. A court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing.

470 U.S. at 686, 105 S.Ct. at 1575 (citations omitted).

(1983). In *Wong Sun v. United States*, the Supreme Court defined the probable cause requirement as the "evidence which would 'warrant a man of reasonable causation in the belief' that a felony has been committed." 371 U.S. at 479, 83 S.Ct. at 413 (quoting *Carroll v. United States*, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925)). Probable cause requires a particularized inquiry and specifically requires less evidence than necessary to secure a conviction, but more than that which constitutes mere suspicion. *Brinegar v. United States*, 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1310–11, 93 L.Ed. 1879 (1949).

Deputy Guay established probable cause that Barber was committing a crime by confirming the ownership of the property in question with Mr. Laskey. Barber disputes the existence of probable cause because, part-time Deputy Turmel vouched for Barber's credibility, Laskey, in Alaska, couldn't properly identify the property, and there were no other eyewitnesses. Barber also contends that Guay's failure to file any court papers is evidence that he lacked probable cause in the first place. Furthermore he argues that he could never have been convicted of theft because he genuinely believed that the property in question was his, and therefore the requisite intent could not be established.

These arguments, however do not undermine Guay's reasonable belief that probable cause was present. Probable cause, after all, need not establish guilt beyond a reasonable doubt. The Court assesses Guay's information at the time without indulging in hindsight. *See Hunter v. Bryant*, 502 U.S. 224, 227–28, 112 S.Ct. 534, 536–37, 116 L.Ed.2d 589 (1991). The Court finds that a reasonable person could have concluded that Barber was stealing based on the evidence available to Deputy Guay at the time. Thus Guay, with the requisite probable cause, made a legal "in presence" arrest of Guay under 17–A M.R.S.A. § 15(B).

## 2. Excessive Force

Barber's excessive force claim rests on the Fourth Amendment, which guarantees that all people will "be secure in their person ... against unreasonable seizures." U.S. CONST. amend. IV. Excessive force claims are governed by the Fourth Amendment's objectively reasonable standard. *Graham*, 490 U.S. at 395, 109 S.Ct. at 1871. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene," paying careful attention to the facts of the specific case at hand, the severity of the crime, the threat of danger to the officer and society, and "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396, 109 S.Ct. at 1872. This test is tempered by the reality that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97, 109 S.Ct. at 1872.

Guay's alleged use of force does not pass constitutional muster. Barber alleges that Guay "wrenched [his] left shoulder around to bring the left wrist behind [his] back ... then grabbed [Barber] with his right hand and twisted [Barber's] right wrist behind his back." (Barber Aff. ¶¶ 34). Next, Deputy Guay "clamped the handcuffs down, not on [Barber's] right wrist but, rather, across the bottom knuckle of [Barber's] thumb." (*Id.* at ¶ 35). Finally Barber claims that: "[o]nce [he] was handcuffed, Deputy Sheriff Guay opened the back door of the cruiser and threw me in head first, so that I landed with my face down on the back seat." (*Id.*)

The Court is cognizant that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of the judge's chambers" violates the Fourth Amendment. *Graham*, 490 U.S. at 396, 109 S.Ct. at 1872 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1030 (2d Cir.), *cert. denied, Employee–Officer John, # 1765 Badge Number v. Johnson*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)). Nevertheless the Court determines that Guay was unjustified in using such force. Barber posed no threat; he didn't resist arrest, or attempt to flee. Nor was Barber involved in a particularly severe or violent

criminal act. Guay was accompanied at the scene by Deputy Turmel, and was thus not at a disadvantage in handling Barber. Consequently Deputy Guay does not qualify for immunity on this claim.

## B. Supervisory Liability: Sheriff Havey

Plaintiff seeks damages against Sheriff Havey, under § 1983, for his failure to properly train Deputy Guay. A superior is not liable for damages under § 1983 on a theory of *respondeat superior. Monell v. Department of Social Services,* 436 U.S. 658, 694 n. 58, 98 S.Ct. 2018, 2037 n. 58, 56 L.Ed.2d 611 (1978); *see Febus–Rodriguez v. Betancourt–Lebron,* 14 F.3d 87, 91 (1st Cir. 1994). However, supervisory personnel need not have participated in the challenged action to incur liability. If there is an underlying constitutional violation, then supervisory liability is contingent upon plaintiff's showing that: (1) the supervisor's conduct or inaction "amounted to reckless or callous indifference to the constitutional rights of others," and (2) an "affirmative link [exists] between the street-level misconduct and the action, or inaction, of the supervisory officials." *See Gutierrez–Rodriguez v. Cartagena,* 882 F.2d 553, 562 (1st Cir.1989) (citations omitted).

Barber asserts that: (a) Guay was both inexperienced and incompetent, (b) that Sheriff Havey knew of this, and (c) that Havey showed deliberate indifference to the constitutional rights of others by failing to supplement Guay's training. Plaintiff first points to Guay's inexperience. At the time of his assignment, Plaintiff alleges that Guay had only one year of experience, and an inadequate understanding of situational analysis. Barber claims that Sheriff Havey knew of these problems with Guay based on Guay's poor scores at the Police Academy, and the unfavorable recommendations Guay received from those in the Somerset County Sheriff's Department who had interviewed him. Additionally, Barber claims that Sheriff Havey was put on notice of Guay's deficiencies due to the District Attorney's investigation into Guay's participation in a warrantless search.

Deputy Guay first trained, and later served as a reserve Deputy in 1990. (Guay Aff. ¶ 1). After completing the one hundred hour Reserve Officer Training Course at the Maine Criminal Justice Academy in the Fall of 1990, Guay was hired by the Somerset County Sheriff's Department. (*Id.*) In 1991 Guay completed the twelve-week police training program at the Maine Criminal Justice Academy, where the curriculum included training on the use of force, and warrantless arrests. (*Id.* at ¶ 2). Guay has received additional training in the use of force, and warrantless arrests since starting with the Somerset County Sheriff's Department. (*Id.*)

Consequently, Barber's evidence is insufficient to establish liability. Section 1983 requires more than simply a showing that the constitutional violation "could have been avoided if an officer had had better or more training, sufficient to equip [the officer] to avoid the particular injury-causing conduct." *City of Canton v. Harris,* 489 U.S. 378, 391, 109 S.Ct. 1197, 1206, 103 L.Ed.2d 412 (1989). "Such a claim could be made about almost any encounter resulting in injury." *Id.* Indeed, a complete lack of training is not *per se* unconstitutional. *See Rodriques v. Furtado,* 950 F.2d 805, 813 (1st Cir.1991).

A failure to train claim must establish deliberate indifference. Here there is no evidence that Havey knew of any poor police work on the part of Guay to the extent that Havey's failure to supplement Guay's training would necessarily lead to the violation of constitutional rights. Despite his poor showing at the Academy, Guay nonetheless completed his training, as well as the statutorily mandated warrantless arrest training, and all the other state training requirements under 25 M.R.S.A. §§ 2801–2808. (Havey Aff. ¶ 5). Furthermore Guay's inexperience alone does not translate into incompetence. Guay was cleared of any wrongdoing in a prior investigation by the District Attorney. Sheriff Havey claims to have administered a departmental policy which "strictly prohibit[ed] the use of excessive or unlawful force by Departmental personnel." (*Id.* ¶ 6). Lastly Havey ordered a review of the department's policies and practices when he arrived on the force in 1991, which did not identify any problems. (*Id.* ¶¶ 11–12). The Court finds that Sheriff

Havey falls within the protective shelter of the qualified immunity doctrine.

### IV. ADA Claims

Defendants' Motion for Summary Judgment as to Barber's ADA claim misses the mark. Defendants claim that the ADA "has absolutely no application to the facts of this case," (Mem. p. 16), because Barber is not an employee under Subchapter I of the ADA, 42 U.S.C. § 12201. Here, however Barber relies on Subchapter II of the ADA, 42 U.S.C. § 12131.

■■■ To establish a claim under § 12131, the plaintiff must show: (1) that he or she is a qualified individual with a disability, (2) who was excluded from participation in or was denied the benefits of the services, programs, or activities, of a public entity, and (3) that such discrimination was the result of the plaintiff's disability. *McDonald v. Commonwealth of Massachusetts*, 901 F.Supp. 471, 478–79 (D.Mass.1995); *Tyler v. City of Manhattan*, 849 F.Supp. 1429, 1439 (D.Kan. 1994). Barber claims that he was denied proper police protection and fair treatment due to his psychological and alcohol problems. While the Court expresses no opinion on the merits of Barber's ADA claim, Barber does state a valid cause of action under the ADA. The facts as to Deputy Guay's conduct toward Barber, as well as Barber's psychological condition present trialworthy issues.

### V. Punitive Damages and Conspiracy Claims

Defendant Guay moves for Summary Judgment on Barber's two remaining claims as well: (1) punitive damages, and (2) conspiracy. Factual disputes remain, however, as to both issues which precludes summary judgment at this stage.

#### A. Punitive Damages

■■■ Punitive damages under § 1983 are available only "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to federally protected rights of others." *Smith v. Wade*, 461 U.S.

30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983). The issue of evil motive, or malice is not often resolved on summary judgment given the fact-driven nature of this inquiry. *See Gual Morales v. Hernandez*, 579 F.2d 677, 680–81 (1st Cir.1978). The facts necessary to establish malice in this case are disputed by the parties, these factual disputes defeat Defendant's Motion for Summary Judgment.

#### B. Conspiracy

■■■ To establish a claim for a civil rights conspiracy, plaintiff must show: (1) an agreement between two or more persons, (2) that such agreement was formed to cause a harm or injury, and (3) an overt act that results in the deprivation of rights. *Earle v. Benoit*, 850 F.2d 836, 845 (1st Cir.1988); *Hampton v. Hanrahan*, 600 F.2d 600, 621 (7th Cir.1979), *rev'd on other grounds*, 446 U.S. 754, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980). Defendant Guay claims that Barber fails to establish the requisite constitutional violation, given Guay's qualified immunity. However given the Court's determination above that Barber's Fourth Amendment excessive force claim survives, this defense fails at this stage of the proceedings.

■■■ Guay also argues that Barber has failed to show the existence of an agreement. Generally, however, the issue of whether a conspiracy exists does not lend itself gracefully to disposition by summary judgment. *Petitti v. New England Tel. & Tel. Co.*, 909 F.2d 28, 34 (1st Cir.1990); *Hampton*, 600 F.2d at 621; *Gual Morales*, 579 F.2d at 680–81. Here factual disputes remain unresolved and thus preclude summary judgment.

### VI. Torts Claims against Defendant Laskey

■■■ Defendant Debbie Laskey filed a Motion for Summary Judgment on the four claims asserted against her by Barber: conspiracy, malicious prosecution, emotional distress, and conversion. Each of these claims revolves around disputed facts which preclude summary judgment. In particular, factual issues remain as to Ms. Laskey's relationship with Deputy Guay, her conduct at the Rockwood house the day of Barber's

arrest, her control over the Rockwood house, her knowledge of Barber's boat, as well as the particulars of Barber's rental of the Rockwood house and his eventual departure. Each of the four torts claimed by Barber involve issues of intent, an issue typically reserved for the jury. *See Tallwood Land & Development Co. v. Botka,* 352 A.2d 753, 756 n. 2 (Me.1976); *Akerley v. Lammi,* 217 A.2d 396, 399 (Me.1966). The Court is satisfied that the factual scenarios surrounding these claims remain in dispute and therefore preclude summary judgment.[4]

## VII. Motion to Strike

Under Federal Rule of Civil Procedure 12(f) the Court may "order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Local Rule 19(b)(1) requires each party filing a motion for summary judgment to provide a "short and concise statement of material facts." Plaintiff moves to Strike Defendants' twenty-two page, seventy-three paragraph Statement of Material Facts on the grounds that it is neither short nor concise, nor does it contain only material facts. Plaintiff also alleges that some of the facts stated by the Defendants lack proper substantiation.

Defendants' Motion is undoubtedly lengthy, and while the Local Rules do not set forth exact page limits for Statements of Material Fact, the Court relies on the good faith of the representing attorneys to set forth the relevant facts in a "short and concise" manner. While certain information regarding Plaintiff Barber's personal life and employment history seem tangential to the suit, the Court is not willing to characterize them as necessarily "immaterial, impertinent or scandalous," F.R.Civ.P. 12(f), and therefore the Court denies the Plaintiff's Motion to Strike.

4. The Court acknowledges, as noted by Plaintiff, Defendant Laskey's apparent violation of Local Rule 19(b)(1), which explicitly requires "a motion for summary judgment [to] incorporate a short and concise statement of material facts." Ms. Laskey has not yet filed a statement of material facts. The Court chooses, however, to address the merits of Ms. Laskey's claims given the factual information provided by her co-defendants, as well as the various other documents in the record. The Court, however, does not condone Ms. Laskey's disregard for the Local Rules governing this Court and orders that the required statement of material facts be filed within five days for review by the Court.

## VIII. Conclusion

For the reasons stated above, it is therefore *ORDERED* as follows:

(1) Defendant Guay's Motion for Summary Judgment is *DENIED;*

(2) Sheriff Havey's Motion for Summary Judgment is *GRANTED;*

(3) Defendant Laskey's Motion for Summary Judgment is *DENIED;*

(4) Plaintiff's Motion to Strike Defendant's Statement of Material Facts is *DENIED;* and

(5) Defendant Laskey is ordered to file a statement of material facts within five days.